# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Adoption of H.B.*, 2012 IL App (4th) 120459

---

| | |
|---|---|
| Appellate Court Caption | In re: the Adoption of H.B., a Minor, GINA MARIE SHREVE, Petitioner-Appellant, v. AMY JO GILLEN, SAMUEL DOUGLAS BAKER, UNKNOWN FATHER, and ALL WHOM IT MAY CONCERN, Respondents-Appellees. |
| District & No. | Fourth District Docket No. 4-12-0459 |
| Argued Filed | September 5, 2012 September 27, 2012 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An adoption petition filed by a child's paternal aunt alleging that the child's mother was unfit was properly dismissed with prejudice on the ground that respondent mother was fit, since respondent did not intend to forego her parental rights or desert her child and she was not habitually addicted to drugs, and the cause was remanded for the entry of an order establishing permanency for the existing arrangement under which the child was in the temporary custody of petitioner and petitioner's mother, including visitation and contact for respondent, and support, if appropriate. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 11-AD-61; the Hon. Arnold F. Blockman, Judge, presiding. |
| Judgment | Affirmed and remanded with directions. |

Counsel on
Appeal

Ellyn J. Bullock (argued), of Law Office of Ellyn J. Bullock, LLC, of Champaign, for appellant.

Anthony A. Bruno (argued), of Bruno Law Offices, of Urbana, for appellee Amy Jo Gillen.

Panel

JUSTICE COOK delivered the judgment of the court, with opinion.
Justices Appleton and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1    On July 19, 2011, petitioner, Gina Marie Shreve, filed a petition for adoption of H.B., alleging, in part, respondent mother was unfit. The trial court conducted a fitness hearing in February 2012 and dismissed petitioner's petition with prejudice as to respondent mother. Petitioner appeals, alleging the trial court's determination respondent is fit was against the manifest weight of the evidence. We affirm and remand with directions.

¶ 2                          I. BACKGROUND

¶ 3    Respondent, Amy Jo Gillen, is the mother of H.B., a girl. Respondent, Samuel Douglas Baker, is the father. Karen Baker is Samuel's mother and also the mother of petitioner, Gina Marie Shreve. In July 2011, petitioner filed a petition for adoption of H.B. (born September 25, 2001). The petitioner is H.B.'s paternal aunt, who has had temporary joint custody of H.B. along with petitioner's mother, Karen Baker, H.B.'s paternal grandmother, since September 2005. The petition alleged H.B.'s birth mother, Amy Jo Gillen (respondent), was unfit because she (1) abandoned the child (750 ILCS 50/1(D)(a) (West 2010)); (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2010)); (3) deserted the child for more than three months next preceding the filing of the adoption petition (750 ILCS 50/1(D)(c) (West 2010)); (4) substantially neglected the child (750 ILCS 50/1(D)(d) (West 2010)); (5) is depraved by reasons of conviction of three felonies, one of which was within the last five years (750 ILCS 50/1(D)(i) (West 2010)); (6) has been addicted to drugs, not prescribed by a physician, for at least one year immediately prior to the filing of the adoption petition (750 ILCS 50/1(D)(k) (West 2010)); and (7) manifested an intent to forego her parental rights (750 ILCS 50/1(D)(n) (West 2010)). Although he is not a party to this appeal, the petition also alleged respondent father, Samuel Douglas Baker (Samuel), was expected to consent to the adoption of H.B., or alternatively, he or any unknown father would be found unfit. In October 2011, the trial court terminated the parental rights of Samuel and any unknown father. Respondent contested the adoption and the court appointed an attorney to represent her. Petitioner filed

an amended petition for adoption which dropped the allegations of unfitness for abandonment and substantial neglect, but proceeded on the five remaining grounds.

¶ 4    In February 2012, the trial court conducted the fitness hearing and the following evidence was presented. In April 2003, respondent and Samuel entered into a joint parenting agreement. Under the agreement, Samuel had custody of H.B.; however, H.B. resided with respondent from June 2003 until May 2004.

¶ 5    On August 4, 2004, H.B.'s paternal grandmother, Karen Baker (Karen), was granted temporary emergency custody of H.B. in Champaign County case No. 03-F-193, following the arrest and incarceration of respondent and Samuel for felony drug charges. On June 3, 2005, due to Karen's potentially serious health issues, petitioner (Karen's daughter) was appointed temporary joint custodian of H.B. Respondent testified she did not receive notice of this modification until after it was filed. She did not file any objections or contest the order; however, she asked the officers at the Indiana jail where she was confined what she could do to respond and was told they did not take anyone to court for out-of-state things such as this (the court allowed this statement for the limited purpose of showing her state of mind). In May 2006, petitioner moved to Illinois to help Karen with H.B., living with them until September 2008, at which point she moved to Champaign until November 2009, while continuing to share custody of H.B. In November 2009, petitioner bought a house in Monticello, Illinois, and H.B. moved in with her permanently.

¶ 6    Respondent admitted she smoked cannabis and did cocaine and ecstasy while pregnant with H.B.; however, once she found out she was pregnant (approximately 2 1/2 months into the pregnancy) she stopped doing drugs. Respondent stipulated to the following convictions: unlawful possession of a controlled substance in 2001 (an Illinois felony); possession of cannabis in 2004 (an Indiana misdemeanor); maintaining a common nuisance (methamphetamine) and possession of methamphetamine in 2004 (both Indiana felonies); unlawful possession of cannabis in 2008 (an Indiana misdemeanor); and maintaining a common nuisance (cannabis) and possession of cannabis with a prior conviction within five years in 2009 (both Indiana felonies). She was sentenced to one year of house arrest and one year and six months of probation on the 2009 convictions. In 2010, while on house arrest, respondent participated in an intensive outpatient drug rehabilitation program. She admitted relapsing and violating her probation in 2011 after testing positive for cocaine and cannabis. Respondent testified she smoked cannabis, but stated the cocaine must have been in the cannabis because she only smoked cannabis. For the last seven months, respondent had been attending weekly Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings which have helped her stay clean.

¶ 7    In 2004, respondent was incarcerated for eight months in Tippecanoe County, Indiana. She was released from jail to a residential drug rehabilitation center in Terre Haute, Indiana, where she resided from January through June 2005. Respondent testified the program was a 90-day program; however, she felt she needed to continue in the program for another month, so she stayed longer.

¶ 8    While at the rehabilitation center, Karen brought H.B. to visit her twice and respondent's mother brought H.B. to visit her once. Respondent also visited with H.B. at her mother's

house approximately three times while in the rehabilitation center on weekend passes. Respondent sent H.B. an Easter card to Karen's address in March 2005. Other than the 2005 Easter card, respondent has not sent H.B. any other cards, letters, or gifts. However, she did bring a blanket for H.B. the last time respondent went to Karen's house. Following her release from the rehabilitation center, respondent continued to visit H.B. at respondent's mother's house once or twice per month and she called H.B. two to three times per month. She admitted she has not provided any financial support or items of necessity for H.B. with the exception of approximately 11 outfits for when H.B. would visit respondent's mother's house. Respondent admitted it was wrong not to provide support but testified she did not have any extra money, and the money she was getting from unemployment was being used to support herself and her son.

¶ 9 According to respondent, this weekend visitation schedule continued until early 2007, when Karen informed respondent she could no longer have H.B. on the weekends, and if she wanted to see H.B., respondent would have to go to Karen's; Karen denied telling respondent this. In 2007 or early 2008, respondent tried calling H.B. one to two times per month, many of which went unreturned. Respondent lived in Indiana and testified it is too far to drive to Karen's without knowing whether she would be able to see H.B. Respondent's mother, Carmen Makemson, also testified at first she would call Karen and Karen would accept her calls, but later she would call and leave messages but no one would return her calls. Respondent's sister, Kari Roberts, testified she tried to call H.B. at Karen's house numerous times over the years but her phone calls went unreturned. Finally, around H.B.'s birthday in 2009, Kari texted Karen's cell phone with the following message, "If I don't hear from [H.B.] within the next 24 hours, then I'm going to report her missing." H.B. called Kari back the next day.

¶ 10 Over the summer of 2008 or 2009, respondent visited H.B. at Karen's home twice, attended one of H.B.'s horseback riding lessons, and met H.B. and petitioner at a gas station for a short visit on a fourth occasion. The last visit occurred in April 2009. Neither petitioner nor Karen informed respondent H.B. was living with petitioner; respondent figured this out on her own in either 2008 or 2009, at which time she began calling petitioner's phone to speak with H.B. Respondent was able to speak with H.B. approximately five times per year. On five or six occasions when respondent called, petitioner hung up on her. Carmen (respondent's mother) also testified petitioner hung up on her twice: the first time she hung up immediately and the second time she told her she would have H.B. call her back and then hung up.

¶ 11 Jeffrey Goble, the father of respondent's son, a year older than H.B., testified he overheard three phone calls between respondent and Karen and respondent and petitioner because the phone was on speaker. The first conversation was in 2005 or 2006. During this call, Karen told respondent she could see H.B., so Goble drove respondent to Karen's house; however, when they arrived, no one was home and no one would answer the phone. The second call took place approximately four months later and Karen told respondent H.B. "didn't need to be around her." The third conversation took place in 2009 between respondent and petitioner. During this call, Goble heard whom he believed to be petitioner tell respondent she would never see H.B. again.

¶ 12	On September 23, 2009, respondent called to speak with H.B. to wish her a happy birthday and to see if she could see her on her birthday; she was able to speak with H.B. However, after speaking with H.B., petitioner told her H.B. did not want to see her anymore and not to call anymore. Respondent has not tried to call or contact H.B. since she was told not to call by petitioner; she also has not sent H.B. any letters, gifts, or cards.

¶ 13	Petitioner denied telling respondent she could not see H.B. anymore and not to call anymore during the September 23, 2009, telephone call. Rather, she testified she told respondent she could not see H.B. on her birthday because they had plans, but if she wanted to see H.B. and H.B. wanted to see respondent, petitioner would make it work on another day. Petitioner admitted the phone call got "ugly" and she hung up on respondent. Petitioner has not taken any proactive efforts to contact respondent and make visitation arrangements or to allow respondent's family to see H.B. Further, she testified she did not encourage H.B. to see respondent but she did coordinate two visits. Petitioner never included respondent in holiday plans with H.B., nor did she invite her to any of H.B.'s sports activities. When respondent left messages for H.B., petitioner testified she would give the messages to H.B., but from the age of eight petitioner left it up to H.B. whether to see respondent or return her calls. Petitioner admitted she has hung up the phone on respondent in the past.

¶ 14	After hearing all the evidence, the trial court found respondent fit and dismissed the amended petition for adoption. This appeal followed.

¶ 15	II. ANALYSIS

¶ 16	Petitioner appeals the trial court's finding she failed to prove respondent unfit by clear and convincing evidence. Specifically, petitioner argues the court erred in (1) finding respondent did not intend to forego her parental rights because it (a) looked at impediments occurring outside the 12-month period allowed by statute, (b) considered impediments not expressly listed in the statute's plain language, and (c) considered respondent's subjective intent to excuse her failure to contact or communicate with H.B. in violation of the statute; (2) looking at impediments occurring outside the 3-month period allowed by statute to excuse respondent's unfitness for desertion; (3) finding respondent has maintained a reasonable degree of interest, concern, and responsibility in H.B.; and (4) finding respondent was not habitually addicted to drugs. We disagree and affirm.

¶ 17	A. Standard of Review

¶ 18	Termination of parental rights is a serious matter, and those petitioning for adoption must prove a parent's unfitness by clear and convincing evidence. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68, 824 N.E.2d 221, 226 (2005). Issues pertaining to the interpretation and application of the Illinois Adoption Act (Act) (750 ILCS 50/1 *et seq.* (West 2010)) are reviewed *de novo*. *Douglas R.S. v. Jennifer A.S.*, 2012 IL App (5th) 110321, ¶ 4, 968 N.E.2d 201. The trial court's factual findings regarding respondent's fitness and credibility assessments are reviewed under the manifest weight of the evidence standard and will be reversed only where the opposite conclusion is clearly apparent. *In re M.R.*, 393 Ill. App. 3d 609, 613, 912 N.E.2d 337, 342 (2009).

¶ 19                          B. Intent To Forego Parental Rights

¶ 20       Defendant first argues the trial court erred in finding respondent did not intend to forego her parental rights because it (a) looked at impediments occurring outside the 12-month period allowed by statute, (b) considered impediments not expressly listed in the statute's plain language, and (c) considered respondent's subjective intent to excuse her failure to contact or communicate with H.B. in violation of the statute.

¶ 21                              1. *Twelve-Month Time Period*

¶ 22       Section 1(D)(n) of the Act provides for a finding of unfitness where there is evidence a parent intends to forego his or her parental rights "as manifested by his or her failure *for a period of 12 months*: (i) to visit the child, (ii) to communicate with the child or agency, although able to do so and not prevented from doing so by an agency or by court order, or (iii) to maintain contact with or plan for the future of the child, although physically able to do so." (Emphasis added.) 750 ILCS 50/1(D)(n) (West 2010).

¶ 23       While not all of the unfitness grounds enumerated in the Act have statutorily set time frames, those that do are further qualified by the express language of section 20a providing, "It is in the best interests of persons to be adopted that *this Act be construed and interpreted so as not to result in extending time limits beyond those set forth herein*." (Emphasis added.) 750 ILCS 50/20a (West 2010). Our supreme court has opined, "The varying presence and absence of time periods in the provisions under section 1(D) demonstrates to us that the legislature believed that, for purposes of establishing certain allegations of unfitness, a parent's conduct during a specified period of time would be relevant." *In re D.L.*, 191 Ill. 2d 1, 11, 727 N.E.2d 990, 995 (2000).

¶ 24       After the close of the fitness hearing in this case, but approximately two weeks before the trial court issued its order, the Fifth District Appellate Court issued an opinion interpreting section 1(D)(n) of the Act. See *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 7, 968 N.E.2d 201. In *Douglas R.S.*, the mother and her new husband filed a petition to adopt the minor child in January 2009, alleging the child's father had not communicated with the child since December 15, 2005, thus indicating his intent to forego his parental rights under section 1(D)(n) of the Act. *Id.* ¶ 3. The father wanted to present evidence during the fitness hearing to explain his reasons for failing to communicate with his minor child. *Id.* However, all the evidence introduced by the father to explain impediments to his communication with the minor child occurred prior to December 15, 2005. *Id.* The court found our supreme court's *In re D.L.* decision instructive. The *D.L.* court held, pursuant to section 1(D)(m) of the Act, only evidence of a parent's conduct during the 12 months following adjudication of neglect could be considered at the fitness hearing; however, evidence outside of the 12-month statutory period could be considered at the best-interests hearing. *Id.* ¶ 7. The *Douglas R.S.* court agreed, finding as follows:

       "[A]s the Illinois Supreme Court noted in *In re D.L.*, the varying presence and absence of time periods in the provisions contained under section 1(D) demonstrate that the legislature believed that, for purposes of establishing certain allegations of unfitness, a

parent's conduct in a specified period of time is relevant. [Citation.] The legislature emphasized that intent by enacting section 20a, specifically directing that the language should not be construed so as to result in extending the time limits beyond those set forth in the Adoption Act." *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 7, 968 N.E.2d 201.

Thus, in its *de novo* review, the court held only evidence occurring in the 12 months following the father's last communication with the child, *i.e.*, December 15, 2005, could be introduced to excuse his failure to communicate with the child. *Id.*

¶ 25 We note petitioner asserts in her brief *Douglas R.S.* is controlling, but in the same paragraph argues since respondent has not had contact with H.B. since September 2009, more than 12 months prior to petitioner filing the July 2011 adoption petition, this should end our inquiry. Petitioner cannot have it both ways–either *Douglas R.S.* controls and the appropriate 12-month period is September 23, 2009, through September 22, 2010, or it does not control and the proper time period is July 20, 2010, through July 19, 2011. We agree with the *Douglas R.S.* decision and conclude the former dates control. Thus, in order to rebut a finding of unfitness for intent to forego parental rights, any evidence submitted explaining why the parent has had no contact with the child must have occurred within the 12 months following the parent's last contact with the child. See *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 7, 968 N.E.2d 201 ("The language [of section 1(D)(n)] clearly establishes a 12-month period for a parent failing to communicate with or keep in contact with the child. The 12-month line of demarcation begins with the date of the last visit or communication between the parent and the child."). This 12-month line of demarcation begins with the parent's last contact or communication with the child because any impediments preventing future contact must have necessarily occurred during or after the last contact or communication with the child. In this case, the relevant period of review is September 23, 2009, through September 22, 2010.

¶ 26 To the extent the trial court considered evidence occurring prior to September 23, 2009, the court erred. However, for reasons discussed below, the court's determination respondent did not intend to forego her parental rights was not manifestly erroneous.

¶ 27 2. *Non-Agency and Non-Court-Ordered Impediments*

¶ 28 Petitioner next contends the trial court erred by considering impediments not expressly listed in the statute's plain language to excuse respondent's failure to communicate with H.B. Specifically, petitioner contends, "The statute expressly states that a birth parent's failure to communicate with a child may be excused only if the parent was 'prevented from doing so by an agency or by court order.' " We disagree.

¶ 29 The language at issue in section 1(D)(n) is as follows: "Evidence of intent to forego his or her parental rights *** as manifested by his or her failure for a period of 12 months *** to communicate with the child or agency, *although able to do so and not prevented from doing so by an agency or by court order ***.*" (Emphasis added.) 750 ILCS 50/1(D)(n) (West 2010). Contrary to petitioner's contention, we do not read the statute to mean *only* obstacles placed in a parent's way by an agency or court order will excuse a parent's failure to communicate with her child. Had the legislature intended the statute to be construed in

-7-

such a manner, it would not have included the preceding, qualifying phrase, "although able to do so." Thus, it was not error for the trial court to consider impediments caused by petitioner within the relevant 12-month period.

¶ 30    3. *The Trial Court's Determination Was Based on Objective Factors*

¶ 31    Petitioner next asserts the trial court erred as a matter of law by ignoring the statute's plain language and considering the subjective intent of respondent to excuse her failure to contact or communicate with H.B.

¶ 32    Section 1(D)(n) further provides as follows:

"In the absence of evidence to the contrary, the ability to visit, communicate, maintain contact, pay expenses and plan for the future shall be presumed. *The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of the foregoing parental acts manifesting that intent, shall not preclude a determination that the parent has intended to forego his or her parental rights*." (Emphasis added.) 750 ILCS 5/1(D)(n) (West 2010).

¶ 33    Specifically, petitioner argues the trial court, in its memorandum and order, erroneously labeled the impediments created by petitioner as objective, when they are actually highly subjective. We disagree.

¶ 34    In its written order, the trial court expressly states, "This section involves an objective determination as to whether a parent maintained meaningful contact with a child and created a presumption that, unless contrary evidence is introduced, a parent had the ability to visit or communicate with his or her child." In finding petitioner failed to prove respondent intended to forego her parental rights under section 1(D)(n) of the Act by clear and convincing evidence, the trial court opined as follows:

"The ground is also a very close call. The Petitioner's obvious argument is that if we get rid of all subjective factors in determining intent, looked at objectively there has been no visitation or any form of contact by Respondent with the minor child for the last year prior to filing the petition so there is an objective intent on the Respondent's part to forego parental rights.

The Court does not agree. Even looked at solely from a[n] objective standpoint the burden is still on Petitioner to prove an intent to forego parental rights by the birth mother for the last year. Even if the Court disregards or ignores the purely subjective issues such as lack of transportation, family issues, stability issues, financial issues, the Court cannot ignore, even in an objective intent analysis, the obstacles and barriers that have been placed in Respondent's way by Petitioner's actions as discussed in detail above. Hence, in analyzing objective intent, those objective barriers must also enter into the equa[t]ion. The Petitioner still has the burden of proving intent to forego all parental rights by clear and convincing evidence. She has failed to do so under all the unique facts of the case."

¶ 35    As discussed previously, the relevant 12-month period for consideration is not the 12 months directly preceding the adoption application, but rather it is the 12-month period

following the respondent's final contact or communication with the child. See *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 7, 968 N.E.2d 201. Thus, it was proper for the court to consider testimony regarding the content of the September 23, 2009, telephone conversation in which, according to respondent's testimony, she was told not to call anymore and that her daughter did not want to see her anymore because this incident occurred within the 12 months following respondent's last contact with H.B. While petitioner's testimony disputes she ever told respondent to stop calling or she could no longer see H.B., the trial court is in the best position to address the credibility of witnesses. See *M.R.*, 393 Ill. App. 3d at 613, 912 N.E.2d at 342. Additionally, it was appropriate for the court to consider petitioner, by her own admission, left the decision of whether to have contact with respondent up to H.B., a young child who has lived with petitioner since 2006. Contrary to petitioner's argument, these are objective impediments caused by petitioner rather than respondent. Based on these two impediments occurring within the appropriate 12-month period, petitioner failed to prove respondent intended to forego her parental rights by clear and convincing evidence. As such, the trial court's determination respondent did not intend to forego her parental rights was not manifestly erroneous.

¶ 36                                C. Desertion

¶ 37    Petitioner next asserts the trial court erred by considering alleged impediments which occurred outside of the "3 months next preceding the commencement of the Adoption proceeding" to excuse respondent's unfitness for desertion. See 750 ILCS 50/1(D)(c) (West 2010). In other words, petitioner contends the court should not have looked at any evidence prior to April 20, 2011, to determine whether respondent intended to permanently forego custody of H.B. We disagree.

¶ 38    Section 1(D)(c) provides for a finding of unfitness where the parent deserts the child "for *more than 3 months* next preceding the commencement of the Adoption proceeding." (Emphasis added.) 750 ILCS 50/1(D)(c) (West 2010). "Desertion connotes conduct which indicates an intention to permanently terminate custody over the child while not relinquishing all parental rights." *In re R.B.W.*, 192 Ill. App. 3d 477, 500, 548 N.E.2d 1085, 1100 (1989); see also *Thorpe v. Thorpe*, 48 Ill. App. 2d 455, 460, 198 N.E.2d 743, 746 (1964) (desertion requires a parent's subjective intent to do so); see also *In re Overton*, 21 Ill. App. 3d 1014, 1018, 316 N.E.2d 201, 204 (1974) ("In consideration of the question of desertion, primary consideration must be given to the intent of the parent. [Citations.] The mere fact of physical separation does not necessarily constitute desertion."). Thus, the subjective intent of respondent is a proper consideration.

¶ 39    In this case, no record evidence supports a finding respondent intended to permanently forego custody of H.B. Respondent voluntarily gave Karen emergency *temporary* custody in 2004 because she was incarcerated. After her release from prison, respondent entered a drug rehabilitation facility until May 2005. From 2005 to 2007, respondent visited H.B. on a fairly regular basis and called her approximately three times per month. Sometime in 2007 or early 2008, the calls dwindled down to one or two per month because many of her calls went unreturned. Neither petitioner nor Karen notified respondent H.B. had moved in with

petitioner. This was a fact respondent finally figured out on her own, at which point she began calling petitioner's phone. It was not until the September 23, 2009, telephone conversation in which petitioner told her not to call anymore and H.B. did not want to see her that respondent finally got discouraged and stopped trying to contact H.B. While respondent has not proactively attempted to regain custody of H.B., this is not proof by clear and convincing evidence she intends to permanently relinquish custody. Thus, the court's determination respondent did not intend to desert H.B. was not against the manifest weight of the evidence.

¶ 40   D. Failure To Maintain a Reasonable Degree of Interest, Concern, or Responsibility

¶ 41   Petitioner next contends the trial court erred in holding petitioner failed to prove, by clear and convincing evidence, respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to H.B.'s welfare. We disagree.

¶ 42   In determining whether a parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to a child's welfare, the court must "examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Ir re Adoption of Syck*, 138 Ill. 2d 255, 278, 562 N.E.2d 174, 185 (1990). In making its decision, a court may consider the parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, *the actions or statements of others hindering or discouraging visitation*, "and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child." *Syck*, 138 Ill. 2d at 278-79, 562 N.E.2d at 185; *In re K.B.*, 314 Ill. App. 3d 739, 753, 732 N.E.2d 1198, 1209-10 (2000). The court must " 'examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts.' " *L.T.M.*, 214 Ill. 2d at 68, 824 N.E.2d at 226 (quoting *Syck*, 138 Ill. 2d at 279, 562 N.E.2d at 185).

¶ 43   In asserting the trial court's decision was against the manifest weight of the evidence, petitioner argues (1) respondent's visitation was not reasonable and was sporadic at best; (2) the trial court omitted weighing respondent's drug use as a factor in failing to maintain interest and concern over H.B.; (3) visitation was never impractical, but if it was, respondent should have sent letters, cards, or gifts; and (4) respondent failed to maintain a legal interest in H.B. because she did not attend the temporary custody hearings or attempt to regain custody of H.B.

¶ 44   The trial court noted it had real concerns about the actions of petitioner that provided substantial impediments to visitation. The court opined, "The major problems with visitation by Respondent seem to have started when the child began living with Petitioner." These problems included petitioner (1) hanging up on respondent at least five times, (2) telling respondent she could not see H.B. again and not to call anymore, and (3) allowing H.B., an eight-year-old child, to make her own decision on whether she wanted to see her mother. The court summarized its position on this issue as follows:

"The bottom line is that circumstances surrounding the acquiring of temporary custody by Petitioner in the F [Family] case, the failure of Petitioner to tell the

Respondent where the child was living, the decision to let the child decide whether she wanted visitation with her mother, and the obvious hostility of Petitioner towards Respondent has to be weighed against the obvious failure of the Petitioner to have contact with the child since September of 2009, a period of 2 1/2 years. Indeed, the mother could have filed a petition, *pro se* [or] otherwise, for visitation in the pending and non-final F case, she could have continued to request visitation from Petitioner, and she certainly could have sent cards, letters or gifts to the child at the Petitioner's address. She certainly knew by September of 2009 that the child was living with Petitioner. Instead she did absolutely nothing until the adoption petition was filed and she was appointed counsel by the Court.

*** It is certainly sad, but somewhat understandable from a subjective perspective, that she did nothing. The Petitioner had constantly hung up on her, had told her she would never see her child again, and had told her the child did not want to visit with her. In addition, she had been living in Indiana, could not afford a retainer for an attorney in light of her economic circumstances, and was certainly cognizant of the fact that Petitioner worked for a local law office."

¶ 45   We noted above the scope of our review is whether a trial court's factual determinations were clearly against the manifest weight of the evidence. In this case, the trial court provided a thoughtful, 26-page memorandum opinion with its order, of which nearly 9 pages pertain directly to this ground of unfitness. We have reviewed the evidence presented during the two-day fitness hearing and find the court's written memorandum accurately represents and fairly weighs all of the evidence presented. Although the evidence is closely balanced on this issue, as the court acknowledged, it is not clearly evident respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to H.B.'s welfare. As such, we affirm the court's judgment on this ground.

¶ 46                                  E. Habitual Addiction to Drugs

¶ 47   Last, petitioner asserts the trial court's finding respondent was not habitually addicted to drugs was against the manifest weight of the evidence. We disagree.

¶ 48   Under the Act, "[h]abitual drunkenness or addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding" is a ground for unfitness. 750 ILCS 50/1(D)(k) (West 2010). A habitual addiction to drugs "means the inability or unwillingness to refrain from the use of drugs where frequent indulgence has caused an habitual craving, manifested by an ongoing pattern of drug use. *** [E]vidence of indulgence without intermission is not necessary to prove addiction. It is sufficient to show that a person has demonstrated an inability to control his or her habitual craving." *In re Precious W.*, 333 Ill. App. 3d 893, 899, 776 N.E.2d 794, 799 (2002).

¶ 49   In this case, it is undisputed respondent was convicted of drug possession offenses in 2001, 2004, 2008, and 2009, and in July 2011 a petition to revoke her probation was filed after she tested positive for cannabinoids and cocaine in June. Respondent participated in an inpatient drug rehabilitation program in 2005, and an outpatient program several years later.

While the trial court questioned respondent's credibility on the length of time she has remained sober (she testified she remained clean for five years with the exception of two occasions), it found respondent was an intermittent drug user rather than a habitual drug addict. Respondent's mother and sister testified she has looked good and healthy for the past several years and neither had observed her using illegal drugs. Respondent testified she regularly attends AA and NA meetings and has been clean since her June 2011 relapse.

¶ 50 The trial court noted, "The record does not come close to establishing an 'habitual addiction to drugs.' There is only one instance proven of drug use during the relevant one year period ***. Although perhaps inferences could be drawn from her prior use under a lesser burden of proof, the standard here is clear and convincing evidence." We agree. Petitioner failed to prove by clear and convincing evidence respondent has a habitual addiction to drugs. Respondent has participated in drug treatment programs and continues to attend AA and NA meetings. Although respondent relapsed in June 2011, at the time of the fitness hearing, she had been clean for seven months. This evidence militates against a finding respondent is unable or unwilling to abstain from drug use. Thus, the court's determination respondent is not unfit under this ground was not against the manifest weight of the evidence.

¶ 51 Because the trial court's findings on all grounds were not against the manifest weight of the evidence, we affirm.

¶ 52 III. EPILOGUE

¶ 53 We note that temporary custodians should foster and encourage close and continuing relationships between the child and parent with the goal of returning the child to the parent's home. *Cf. In re H.C.*, 305 Ill. App. 3d 869, 877, 713 N.E.2d 784, 790 (1999) (noting the "primary goal of the Juvenile Court Act of 1987 [citation] is to strengthen family ties whenever possible and to reunify the original family"). Likewise, any hostility or negativity toward the minor's mother should never be seen or heard by the minor. In this case, emergency temporary custody of H.B. was awarded to Karen on August 5, 2004, and petitioner was named an emergency joint temporary custodian on September 21, 2005. The record is clear petitioner did nothing to encourage H.B. to have a relationship with respondent. From at least the age of eight years, petitioner reports she left the decision whether to return respondent's calls or whether to see respondent at all up to H.B. On several occasions, petitioner hung up the phone on respondent. The record is unclear whether H.B. was aware of petitioner's negativity toward respondent. Petitioner never included respondent in any activities with H.B., such as holidays, birthday parties, sporting events (with the exception of one horseback riding lesson), or school events. In fact, when respondent asked to see H.B. on her birthday in September 2009, rather than inviting her along to celebrate with H.B. on her birthday, petitioner denied her visitation because they already had plans. As the temporary joint custodian of H.B., instead of supporting a continuing relationship between H.B. and respondent, petitioner seems to be doing everything she can to discourage such a relationship.

¶ 54                                    IV. CONCLUSION

¶ 55        We remand this case to the trial court to fashion an order that establishes permanency for
the custodial arrangement which has been enjoyed by the child for the past seven years. Such
an order, whether pursuant to guardianship or the award of permanent custody, should set
forth the rights and responsibilities of all parties having standing in this case, including
visitation, nonvisitational contact, and, if appropriate, support.


¶ 56        Affirmed and remanded with directions.