NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210145-U

NOS. 4-21-0145, 4-21-0146, 4-21-0147 cons.

FILED
August 4, 2021
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* L.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
|       Petitioner-Appellee, | ) | No. 17JA27 |
|       v.    (No. 4-21-0145) | ) | |
| Karrissa M., | ) | |
|       Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* J.R., a Minor | ) | |
| | ) | No. 17JA28 |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.    (No. 4-21-0146) | ) | |
| Karrissa M., | ) | |
|       Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* A.R., a Minor | ) | |
| | ) | No. 17JA29 |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.    (No. 4-21-0147) | ) | Honorable |
| Karrissa M., | ) | Thomas W. Funk, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in finding respondent unfit to parent her minor children or in terminating respondent's parental rights.

¶ 2         On September 24, 2020, the trial court found respondent, Karrissa M., unfit to

parent her minor children, L.M. (born January 11, 2012), J.R. (born June 27, 2014), and A.R. (born February 13, 2016). On March 8, 2020, the court terminated respondent's parental rights. Respondent appeals, arguing the court erred both in finding that she was an unfit person and in finding termination of her parental rights was in the best interest of L.M., J.R., and A.R. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4          On August 9, 2017, the State filed petitions for adjudication of wardship, alleging L.M., J.R., and A.R were neglected, as that term is defined under the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2016)). Specifically, the petitions alleged the children were neglected in that their environment was injurious to their welfare as evidenced by the failure of respondent and her paramour, Darrick R., the father of J.R. and A.R., to ensure the children were provided a safe and nurturing environment (*id.* § 2-3(1)(b)). Each petition further alleged the children's environment was injurious to their welfare as a result of domestic violence between respondent and Darrick (*id.*). Finally, the State alleged the children were neglected because A.R. was not receiving medical care or support necessary for her wellbeing (*id.* § 2-3(1)(a)). The same day, the trial court conducted a shelter care hearing and entered an order granting the Department of Children and Family Services (DCFS) temporary custody of the minors.

¶ 5          On September 14, 2017, respondent entered into a stipulation, acknowledging that L.M., J.R., and A.R were neglected in that A.R. had not received medical care or support that was necessary for her wellbeing. In association with the stipulation, the assistant state's attorney informed the trial court that, if the matter were to proceed to a hearing, the State would produce evidence that A.R. suffered a burn after playing near a hot stove, and neither respondent nor Darrick sought medical treatment for the injury.

¶ 6          Subsequently, the Rutledge Youth Foundation (RYF), an agency operating under

contract with DCFS, filed a family service plan. Under the plan, respondent was required to, among other things, cooperate with RYF to successfully complete her services, participate in weekly visits with the children, and complete a mental health assessment as well as a parenting assessment.

¶ 7    The trial court conducted a dispositional hearing on October 26, 2017. At the conclusion of the hearing, the court found respondent unfit to parent L.M., J.R., and A.R. because she was without stable housing and needed to participate in parenting classes and therapy. The court made the minors wards of the court and granted custody and guardianship of the minors to DCFS.

¶ 8    On September 10, 2018, RYF filed a revised family service plan. Under this plan, in addition to the requirements contained in the initial service plan, respondent was required to apply the skills she learned in her parenting class during her visits with the children and participate in domestic violence counseling.

¶ 9    On November 5, 2018, the State filed a petition to terminate respondent's parental rights. (We note the State also sought to terminate the parental rights of the father of L.M. to his child and the parental rights of Darrick to J.R. and A.R. and that, ultimately, their parental rights were terminated. However, neither Darrick nor L.M.'s father is a party to this appeal, and we discuss the facts only as they relate to respondent, except to the limited extent required to fully address respondent's arguments on appeal.) In its petition, the State alleged respondent was an unfit person under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2016)) in that from September 15, 2017, through June 15, 2018, and from January 31, 2018, through October 31, 2018, she failed to make reasonable efforts to correct the conditions that were the basis for removal of the minors from her care. The State further alleged respondent was an unfit person under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that, during the same periods,

she failed to make reasonable progress toward the return of the minors to her care.

¶ 10	The trial court conducted a fitness hearing on May 2, 2019. During the hearing, the State first presented the testimony of Tiesha Hawkins, L.M., J.R., and A.R.'s first caseworker at RYF. Hawkins testified that, under respondent's service plan, she was required to participate in individual counseling, parenting classes, domestic violence counseling, and substance abuse counseling. Hawkins further testified that respondent was required to cooperate with RYF and to attend visits with her children as a condition of the service plan. According to Hawkins, while she served as the minors' caseworker, respondent was adequately participating in counseling services, substance abuse services, and domestic violence services. Hawkins also testified, although respondent had been evicted from her apartment for failing to pay rent, she subsequently obtained appropriate housing and obtained employment, but respondent quit her job to seek employment that provided more hours. Respondent completed parenting classes in December 2017, but Hawkins testified respondent still had some difficulty applying what she had learned during her classes in her visits with her children. Additionally, Hawkins testified that respondent had tested positive for marijuana during a drug test, had acknowledged she "struggle[d]" to give up marijuana, and was "trying to stop using."

¶ 11	The State also presented testimony from Codi Poe, L.M., J.R., and A.R.'s caseworker at RYF from July 2018 until December 2018. Poe testified respondent completed her domestic violence classes and parenting classes and was adequately participating in individual counseling and substance abuse counseling. Poe further testified respondent had become employed and had stopped using marijuana. However, Poe also testified that respondent did not put enough effort into using the skills she learned during the parenting class during her visits with L.M., J.R., and A.R. and, as a result, Poe considered requiring respondent to participate in additional parenting

- 4 -

classes.

¶ 12    Respondent did not present any evidence at the fitness hearing.

¶ 13    After the parties presented argument, the trial court denied the petition to terminate parental rights. The court found respondent had "completed each and every task that [she had] been required to do." Although the court denied the petition to terminate parental rights, the children remained wards of the court in the custody of DCFS.

¶ 14    Following the fitness hearing, the trial court conducted permanency review hearings on March 14, 2019, November 7, 2019, and April 23, 2020. At each of these permanency review hearings, the court found respondent remained unfit to parent L.M., J.R., and A.R. and had not made reasonable and substantial progress or reasonable efforts toward returning the minors home.

¶ 15    On October 30, 2019, RYF filed another family service plan. Under this plan, in addition to the goals set forth in the previous plans, respondent was required to, among other things, participate in parent coaching and a parenting capacity assessment, continue taking the mental health medications prescribed by her doctor, and engage in financial literacy and substance abuse treatment programs. The plan also required respondent to participate in couple's counseling with Darrick and to attend L.M., J.R., and A.R.'s mental health and medical appointments.

¶ 16    On April 15, 2020, the State filed a second petition to terminate parental rights. In this petition, the State alleged respondent was an unfit person in that she: (1) was subject to habitual drunkenness or addiction to drugs, other than as prescribed by a physician, for at least one year prior to April 15, 2020 (750 ILCS 50/1(D)(k) (West 2018)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of her children between November 1, 2018, and August 1, 2019, and between July 10, 2019, and April 10, 2020 (*id.* § 1(D)(m)(i));

(3) failed to make reasonable progress toward the return of her children between November 1, 2018, and August 1, 2019, and between July 10, 2019, and April 10, 2020 (*id.* § 1(D)(m)(ii)); and (4) was unable to discharge her parental responsibility as supported by competent evidence from a licensed clinical psychologist (*id.* § 1(D)(p)). The State also alleged it was in the best interest of L.M., J.R., and A.R. that respondent's parental rights be terminated.

¶ 17 The trial court conducted a fitness hearing on September 11, 2020. During the hearing, the State first called Dr. Judy Osgood, a licensed clinical psychologist. Dr. Osgood testified she received a referral from DCFS to conduct a parenting capacity assessment for respondent and, after reviewing pertinent "background information" on the case, she interviewed respondent around November of 2019. Dr. Osgood further testified that, during her interview with respondent, respondent "didn't really acknowledge the severity of her mental health, substance abuse, domestic violence with the father, and the risk to the children." According to Dr. Osgood, respondent stated she "smoked marijuana frequently," including while she was pregnant with all three of her children, and self-medicated with the substance to manage her depression and anxiety. As part of her interview with respondent, Dr. Osgood also conducted a psychological examination and diagnosed respondent with bipolar disorder, substance-related disorder, post-traumatic stress disorder, and parent/child relational problem. Dr. Osgood opined that, without substance abuse treatment and mental health treatment, "there would be no way to prevent the same problems from occurring with the children." Dr. Osgood concluded that, as a result of respondent's mental health and substance abuse issues, respondent could not safely and responsibly parent L.M., J.R., and A.R.

¶ 18 The State also called Stacy McIntyre, a case aide with RYF. According to McIntyre, on February 20, 2020, she supervised a visit between respondent and L.M., J.R., and A.R. McIntyre

testified that, during the visit, J.R. misbehaved and respondent attempted to discipline him by placing him in a corner. J.R. refused to stand in the corner and told respondent to "shut up." Respondent then told J.R. to "shut up," that he "should be lucky everybody was watching or she would make his head spin," and to "get into the f***ing corner." McIntyre explained that, after J.R. again refused to stand in the corner, respondent "grabbed him by his arm" and "jerked him from the corner," at which point McIntyre ended the visit. As McIntyre was loading the children into her car, respondent approached the vehicle and told J.R. "never f***ing come back to a visit."

¶ 19          Next, the State called Bailey Bridges, the children's caseworker at RYF from January 2019 until August 2020. Bridges testified that, while she served as caseworker, respondent had attended most of her visits with the children but had not demonstrated adequate parenting skills during those visits. Bridges explained that, during the visits, there had been issues regarding discipline and, on occasion, respondent was unable to provide food for the children. Bridges also testified that, while she served as the children's caseworker, respondent had been terminated from multiple jobs (one of which was as a result of the coronavirus pandemic), moved out of her apartment, and was "bouncing from different homes." Bridges further testified that respondent had tested positive for tetrahydrocannabinol (THC) several times but had reengaged in substance abuse services for short periods, although she always quit participating in the service before completing the entire treatment program. According to Bridges, respondent had only attended 2 of the children's medical appointments out of 20 about which she was informed and was permitted to attend.

¶ 20          Following Bridges's testimony, the trial court continued the fitness hearing to September 24, 2020. At the continued hearing, respondent testified on her own behalf. Respondent testified she had attended the majority of the weekly visits with her children, had recently become

employed at Staybridge Suites, and was preparing to start a second job. According to respondent, she had completed parenting classes, parenting coaching, and a financial literacy class. Additionally, although she had stopped taking the medication she had been prescribed to manage her anxiety and depression, she had reengaged in individual counseling. Respondent further testified that around December of 2019, she moved to Springfield and lived with several different friends in their apartments. Respondent acknowledged that, because she did not have a permanent residence, she was currently unable to take care of the children. Regarding her marijuana use, respondent testified she had smoked the substance during the entire period between November 1, 2018, and April 10, 2020, and had done so daily until December 2019. Respondent continued that marijuana had been "a problem of [hers]" for years, so much so that, in March 2020, she asked Bridges to admit her to inpatient rehabilitation treatment. Although respondent did not believe she was addicted to marijuana, she testified, "I guess it's just hard to stop because once your body is so used to doing the same thing for so long, it's hard to stop."

¶ 21 Darrick also testified on his own behalf. As pertinent to this appeal, Darrick testified that, at the time of the fitness hearing, he had been smoking marijuana for several months. However, he testified he only smoked marijuana at most one day a week and did not smoke marijuana every week.

¶ 22 After the presentation of the evidence, the trial court found respondent was an unfit person under sections 1(D)(k), (m)(i), and (m)(ii) of the Adoption Act. Regarding the court's finding that respondent was subject to habitual drunkenness or addiction under section 1(D)(k), the court found this allegation was established "by her own admission [that] she had an addiction to Cannabis." Relevant here, the court found Darrick, who the State had also alleged was an unfit person under section 1(D)(k) of the Adoption Act, was not unfit under that provision.

¶ 23 Subsequently, the trial court conducted a best-interest hearing. At the hearing, the State called Danielle Lewis, who had been the caseworker for L.M., J.R., and A.R. at RYF since September 2020. Lewis testified L.M., J.R., and A.R. were not placed together but were either placed with other family members or with fictive kin. The children had been in their respective placements since 2017, and each foster family was providing for the needs of the child who had been placed with them, including the child's medical and mental health needs. Lewis further testified that, although each child had certain "behavioral issues" when they were first placed in their respective foster homes, those behaviors had "improved." According to Lewis, L.M., J.R., and A.R. each had a "strong attachment" to his or her respective foster family.

¶ 24 At the conclusion of Lewis's testimony, the trial court continued the hearing until March 8, 2021. At that hearing, the State called Sarah Davis, who had served as J.R. and A.R.'s therapist since January 2019. Davis testified that she diagnosed both J.R. and A.R. with attention-deficit/hyperactivity disorder and oppositional defiance disorder. Davis also diagnosed A.R. with post-traumatic stress disorder. According to Davis, since J.R. and A.R. had started treatment with her, she had observed "significant improvement" in their behavior and symptoms.

¶ 25 Respondent testified on her own behalf. Respondent testified that she currently resided at a domestic violence shelter and, before that, had been living with a friend. However, respondent also testified she had put a down payment on a mobile home and intended to move in soon. Respondent further testified she was employed and had been in her current position for approximately three months. According to respondent, she had a "close and loving bond" with her children and was able to take care of them. Respondent also testified she had provided for her children before they were removed from her care and had been "a great parent."

¶ 26 The guardian *ad litem* presented as a witness Jody Carroll, one of L.M.'s foster

parents. Carroll testified, before L.M. had been removed from respondent's care, she and her daughter had been L.M.'s babysitters. Carroll was married, and L.M. was residing with the couple in their home. L.M. was in third grade at the local elementary school, which he had attended since kindergarten. Carroll testified the school had a dedicated team to work on L.M.'s unique needs and she was "in constant contact" with his educators. According to Carroll, L.M. had been diagnosed with attention-deficit/hyperactivity disorder, which Carroll managed with prescription medication and counseling. Carroll further testified she had "seen [L.M.'s] behavior evolve through the duration of the case." L.M. participated in local sports programs and swimming lessons, and Carroll ensured he saw his siblings regularly. Finally, Carroll testified she and her husband were willing to adopt L.M.

¶ 27 The guardian *ad litem* next called Brittany Matherly, the foster parent of J.R. and his maternal aunt by marriage. Matherly testified J.R. had been placed in her home in 2017 and currently lived with her, her husband, and their daughter, with whom he had a "very good bond." Matherly further testified J.R. attended behavior therapy biweekly and was on medication to manage his mental health condition. According to Matherly, she and her husband had created a structure and routine for J.R. and this routine greatly helped control his behavioral issues. Matherly testified J.R. was currently in the first grade and although he had exhibited some disruptive behaviors when he first started attending school, those behaviors had decreased. However, J.R. had struggled with remote learning during the coronavirus pandemic. Outside of school, J.R. took swim lessons and was scheduled to play tee-ball and football once the seasons began. Matherly concluded that she made sure J.R. was able to see his siblings regularly and was willing to adopt J.R.

¶ 28 The guardian *ad litem*'s final witness was Cary Fitzpatrick, the foster parent of A.R.

and her maternal great-aunt. Fitzpatrick testified A.R. had been in her care since A.R. was 18 months old and, in that time, she had observed A.R.'s behavioral issues improve. According to Fitzpatrick, A.R. attended regular counseling sessions and appointments with a behavioral pediatrician. Additionally, Fitzpatrick testified that A.R. was doing well in preschool, where she received speech therapy services. Fitzpatrick also enrolled A.R. in tumbling, which A.R. had enjoyed. Fitzpatrick testified she loved A.R., was willing to adopt her, and would ensure A.R. had regular visits with L.M. and J.R.

¶ 29        After the parties presented argument, the trial court found termination of respondent's parental rights was in the best interest of L.M., J.R., and A.R.

¶ 30        This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32        Section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2018)) "sets forth a two-step process for the involuntary termination of parental rights." *In re M.I.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. First, the court must find, by clear and convincing evidence, that "[the] parent is an unfit person as defined in Section 1 of the Adoption Act [(750 ILCS 50/1 (West 2018))]." 705 ILCS 405/2-29(2) (West 2018). After a finding of parental unfitness is made, the court then considers whether termination of the parent's rights is in the minor's "best interest." *Id.* In the present case, respondent challenges both the court's determination she was an unfit person and its determination that termination of her parental rights was in the best interest of L.M., J.R., and A.R.

¶ 33        "A reviewing court accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. "A court's decision

regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.* "As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence supports it on any one of the grounds alleged." *In re Byata I.*, 2014 IL App (2d) 130558-B, ¶ 30, 43 N.E.3d 139.

¶ 34 Initially, we note respondent only challenges the trial court's finding that she was unfit under section 1(D)(k) of the Adoption Act and fails to mention or address the court's finding that she was an unfit person under sections 1(D)(m)(i) and 1(D)(m)(ii). As a result, she has forfeited any claim that the court's fitness determination as to those two grounds was against the manifest weight of the evidence. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited[.]"). As previously stated, we may affirm the court's fitness finding if only a single ground alleged by the State is properly proved. Therefore, by failing to challenge all of the grounds upon which the court determined respondent was unfit, respondent effectively concedes she was an unfit person. See *In re D.L.*, 326 Ill. App. 3d 262, 268, 760 N.E.2d 542, 547 (2001).

¶ 35 Even setting aside respondent's forfeiture, we find the evidence amply demonstrated that respondent was an unfit person on the ground that she does challenge on appeal. Specifically, the evidence supported the trial court's determination that respondent was an unfit person in that she exhibited a "[h]abitual drunkenness or addiction to drugs, other than as prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding." 750 ILCS 50/1(D)(k) (West 2018). Here, the State filed the petition to terminate respondent's parental rights on April 15, 2020. Thus, the State was required to prove respondent was an unfit person under this section of the Adoption Act during the period between that date and April 15, 2019. See *In re J.J.*, 201 Ill. 2d 236, 243-45, 776 N.E.2d 138, 143 (2002).

¶ 36 As used in the Adoption Act, a habitual addiction to drugs means "the inability or

unwillingness to refrain from the use of drugs where frequent indulgence has caused an habitual craving, manifested by an ongoing pattern of drug use." (Internal quotation marks omitted.) *In re Adoption of H.B.*, 2012 IL App (4th) 120459, ¶ 48, 976 N.E.2d 1193. In determining whether a person has a habitual addiction to drugs, "evidence of indulgence without intermission is not necessary." (Internal quotation marks omitted.) *Id.* Instead, "[i]t is sufficient to show that a person has demonstrated an inability to control his or her habitual craving." (Internal quotation marks omitted.) *Id.* As respondent acknowledges in her brief, during the fitness hearing in the present case, she admitted that she smoked marijuana daily until December 2019. Although, at that point, she stopped smoking the drug as frequently, in March 2020, respondent asked to be admitted to inpatient treatment for her marijuana use, acknowledging that she had a "problem" with the drug and that she found it "hard to stop because [her] body [was] so used to doing the same thing for so long." These admissions were supported by respondent's caseworker who testified respondent tested positive for THC on several occasions during the pendency of these cases. As the trial court properly determined, this evidence clearly and convincingly demonstrated that respondent had an addiction to marijuana and that she could not control her craving for that drug during the period between April 15, 2019, and April 15, 2020.

¶ 37        Nonetheless, respondent contends the trial court erred in finding her unfit for two reasons. First, respondent argues the court erred in finding her unfit because, as of January 1, 2020, it was legal to use marijuana in Illinois in certain circumstances (see 410 ILCS 705/10-5 (West 2020)). This argument is without merit. Setting aside the fact that respondent regularly used marijuana well before the substance was legalized in Illinois, and even assuming respondent complied with all of the requirements set forth in the Cannabis Regulation and Tax Act when she used marijuana, respondent's argument is rebutted by the plain language of section 1(D)(k) of the

Adoption Act. Contrary to her argument, section 1(D)(k) of the Adoption Act did not require the State to show that the respondent was addicted to an "illegal drug" or a "controlled substance." Instead, the Adoption Act only requires a showing that the respondent was addicted to "drugs" that were not prescribed by a physician. 750 ILCS 50/1(D)(k) (West 2018). Thus, whether a person is permitted by law to use a drug to which she is addicted is irrelevant under section 1(D)(k) of the Adoption Act.

¶ 38　　　　Respondent's second argument is that the trial court erred in finding her to be an unfit person under section 1(D)(k) of the Adoption Act because the court declined to make the same finding with respect to Darrick even though the evidence showed he also used marijuana during the relevant time period. This argument is without merit because respondent's use of marijuana and Darrick's use of marijuana were significantly different. As stated above, respondent testified she had been using marijuana daily for an extensive period of time, admitted that she had a "problem" with the substance, and admitted that she found it "hard to stop" using it. By contrast, Darrick testified he only used marijuana at most one day per week. As the trial court determined, this evidence indicated that, unlike respondent, Darrick was not addicted to marijuana and could refrain from the use of the substance. Because the evidence presented at the fitness hearing demonstrated that respondent's use of marijuana was significantly different from Darrick's use of marijuana, the court did not err in finding respondent to be an unfit person under section 1(D)(k) of the Adoption Act while declining to find Darrick unfit under the same provision.

¶ 39　　　　Respondent also contends the trial court erred in finding termination of her parental rights was in the best interest of L.M., J.R., and A.R. Like the court's finding of unfitness, "[a] trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence." *M.C.*, 2018 IL App

(4th) 180144, ¶ 35. The court's best-interest determination is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Id.*

¶ 40　　　　　　Section 1-3 of the Juvenile Court Act of 1987 lists multiple factors the trial court must consider in determining whether termination of a parent's rights is in the minor's best interest. 705 ILCS 405/1-3(4.05) (West 2018). Those factors, which must be considered in the context of the child's age and developmental needs, are: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 41　　　　　　The evidence presented at the best-interest hearing was sufficient for the trial court to find that termination of respondent's parental rights was in the best interest of L.M., J.R., and A.R. The children had been placed in separate homes but were living with family members, in the case of J.R. and A.R., or with fictive kin, in the case of L.M. The children had been in these placements for over three years and each child had a "strong attachment" to his or her respective foster family. The "behavioral issues" each child had exhibited when they were first placed in foster care had improved, and each child's foster family was providing for the child's physical and mental wellbeing. Although the children's schedules had been interrupted due to the coronavirus pandemic, they were nonetheless generally doing well in school and were participating in extracurricular activities. Each child's foster family was willing to provide permanence through adoption. By contrast, respondent had not maintained consistent housing since January 2020 and had not maintained steady employment throughout the pendency of the cases. Further, although

respondent argues termination of her parental rights would not be in the children's best interest because the children were separated from each other, we note the foster parents all testified they facilitated visits among the children regularly and that they would continue to facilitate visits in the future. Thus, the trial court's finding that termination of respondent's parental rights was in the best interest of L.M., J.R., and A.R. was not against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43            For the reasons stated, we affirm the trial court's judgment.

¶ 44            Affirmed.