NOTICE

Decision filed 12/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210228-U

NO. 5-21-0228

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF H.M.F.D. and H.J.F.D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (Kenneth B. and Electa M., | ) | Madison County. |
| | ) | |
| Petitioners-Appellees, | ) | |
| | ) | |
| v. | ) | No. 20-AD-113 |
| | ) | |
| Jasmine F., | ) | Honorable |
| | ) | Amy Maher, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's findings that the respondent mother was unfit based on her intent to forgo her parental rights and her failure to maintain a reasonable degree of interest, concern, or responsibility for the minor children's welfare are affirmed where the findings were not against the manifest weight of the evidence. The court's best-interest determination was also not against the manifest weight of the evidence.

¶ 2    The respondent mother, Jasmine F., appeals the judgment of the circuit court of Madison County terminating her parental rights to her minor children, H.M.F.D. and H.J.F.D. On appeal, Jasmine argues that the court's finding that she was an unfit parent under sections 1(D)(b), 1(D)(n), and 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(b), (n), (m)(i) (West 2020)) was against the manifest weight of the evidence. Additionally, she asserts that the court's finding

1

that termination of her parental rights was in the best interests of the children was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    H.M.F.D and H.J.F.D. were born on April 14, 2016. The children resided with Jasmine and her now-estranged husband, Danny D., in Sonoma County, California. In July 2016, when the children were approximately three months old, they were taken into protective custody in California due to significant, unexplained physical injuries. Between them, they had sustained 13 fractures that were caused by various incidents; the fractures revealed different stages of healing. A specialist at Oakland Children's Hospital assessed the injuries and determined that they were nonaccidental and "highly concerning" for physical abuse. Jasmine and Danny never adequately explained the cause of the fractures, and any suggestions provided by them were quickly eliminated as possibilities by the medical professionals. Ultimately, the California court made a finding of nonaccidental physical abuse but did not make any findings about how the injuries occurred or who inflicted them.

¶ 5    During the course of the California case, it was determined that the petitioner, Kenneth B., was the biological father of the children. Kenneth lived in Illinois. He was eventually granted sole physical and legal custody of the children, and he moved them to Illinois in April 2017. The California orders imposed strict conditions on contact between Jasmine and the minor children, but the case was closed in November 2017, and those orders were no longer in effect after the case was closed. The court did not enter any order with regard to parenting time for Jasmine and instead placed the burden on her to establish a change of circumstances to warrant parenting time.

¶ 6    In or around October 2018, Jasmine moved to Illinois and resided with her boyfriend, Christopher K. In July 2020, she filed a petition requesting parenting time with the children in Madison County (case No. 20-F-290). After being served with Jasmine's petition, Kenneth and Electa M., his fiancée, filed a petition to adopt the children in Madison County on August 24, 2020 (case No. 20-AD-113), the case at issue here. In the petition to adopt, they contended that Jasmine was an unfit parent in that (1) she abandoned the children; (2) she deserted the children; (3) she failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare; (4) she neglected the children; (5) she was extremely and/or repeatedly cruel to the children; (6) there had been at least two findings of physical abuse regarding the children; (7) she failed to protect them from conditions within an environment that were injurious to their welfare; (8) she failed to make reasonable efforts to correct the conditions that were the basis for their removal from her care; (9) she had evidenced an intent to forgo parental rights as manifested by her failure for a period of 12 months to visit the children, communicate with them, maintain contact with them, and/or plan for their future; and (10) she failed to provide them with adequate food, clothing, and shelter. The petition further contended that it was in the best interests of the children that Jasmine's parental rights be terminated, and Kenneth and Electa be permitted to adopt the children.

¶ 7    At the February 26, 2021, fitness hearing, the following testimony was presented. Monica Julian, the children's guardian *ad litem* (GAL) in the California case, testified that the children were approximately three months old when they were brought into care with significant physical injuries. A specialist at Oakland Children's Hospital assessed them, and it was discovered that they both had numerous fractures in their legs and ribs from various incidents. The specialist concluded that the injuries were nonaccidental and "highly concerning for physical

3

abuse." The only people who had access to the children were Jasmine, Danny, and the daycare; the daycare was ruled out as a possible source for the injuries. Although Jasmine suggested that the injuries might have been caused from the children's older half-brother playing roughly with them, the medical professionals ruled that out as a possible cause.

¶ 8    Initially, Jasmine had supervised visits with the children that were no physical contact. Julian did not remember Jasmine missing any of the scheduled visits. Eventually, Jasmine was allowed two supervised visits with some physical contact, but she was prohibited from lifting the children. After those visits, Jasmine never visited them again. Julian explained that there was no trial court order prohibiting Jasmine from visiting the children at this time, and she believed that the social worker was attempting to coordinate another visit, but Julian did not recall why it did not happen. After almost one year in foster care, the children went to live with Kenneth in Illinois, and he was granted full physical and legal custody of them.

¶ 9    Although Jasmine's attorney requested parenting time for Jasmine, the California court did not mention anything about parenting time when it entered the order awarding Kenneth sole custody of the children. Julian explained that there were approximately three hearings where they attempted to resolve the issue of parenting time, but Jasmine did not appear at those hearings, and the court eventually entered the final order. At the time the court entered the order, it explained that it did not want to deny Jasmine parenting time, but the onus was on her to bring the issue forward in the corresponding family case in Illinois. Jasmine did not have any visits with the children once they moved to Illinois. Julian did not know whether Jasmine knew Kenneth's address or whether Jasmine had the resources to travel to Illinois to visit the children. Any visits before the case was closed would have had to be supervised. Julian explained that, because this was a case of severe physical abuse to children under five years old, formal

4

reunification services were not offered or ordered for Jasmine. Jasmine was encouraged to participate in parenting classes to the extent that it would facilitate visitation.

¶ 10   Kenneth testified that he discovered the children had been physically abused when Jasmine contacted him about three weeks after they were placed in protective custody. He learned that there were approximately 13 dislocated and broken bones between the two girls, and they had been hospitalized. While the children were in protective custody, he went to California once per month and for every court hearing. In April 2017, the children moved to Illinois with him.

¶ 11   Between the time that the children moved to Illinois and the closing of the California case in November, he received some communication from Jasmine about seeing the children, but he did not allow her to have any contact with them. He believed that it was not in their best interests to see her. She also texted him about putting the children on her health insurance, but they were already covered by health insurance. At that time, she also told him that she left some items for the children at her mother's house, who did not live too far from him, but he never went there to pick up the items. In that same message exchange, he told Jasmine to stop contacting him and that if she contacted him again, he would consider it harassment. He blocked her phone number, blocked her on social media, and asked his family to block her on social media.

¶ 12   Kenneth testified that Jasmine never sent cards or letters to the children, birthday or Christmas gifts, or money for the children's care. She had done nothing to act as a parent to the children. He acknowledged that he did not give his address to her, and she did not know where he lived. After he told her not to contact him anymore, the next contact he had from her was

when he was served with a summons in the family case where she requested parenting time. He filed the petition to adopt the children after he learned that she was seeking parenting time.

¶ 13    Electa testified that she was engaged to Kenneth, she lived with him, and she had been a part of the minor children's lives since they moved to Illinois. She did not know if Jasmine knew their address but maintained that Jasmine could have found it on Google. She has had the same phone number for 20 years, which could have also been found through an internet search. Jasmine never sent the children a letter or card, tried to visit them at the house, attempted to contact them through Electa, or provided any resources to take care of them. However, Electa acknowledged that, during the California court proceedings, she blocked Jasmine from seeing her Facebook account because she did not want Jasmine to see her personal life. When the children initially moved to Illinois, they had a few visits with their brother, Jasmine's oldest son, that were coordinated through Jasmine's mother. The visits stopped because Electa felt like the grandparents lacked interest in maintaining that relationship. Those visits never included Jasmine. Electa did not know if Jasmine's mother had her phone number.

¶ 14    Alexa Dour, Jasmine's friend, testified that she has been friends with Jasmine since the fifth grade, and she and Kenneth went to school together. The last time that she spoke to Kenneth was approximately three months ago, and at that time, Kenneth told her that he was single and no longer engaged to Electa. Alexa regularly spoke to Jasmine about the children and how Jasmine was trying to get them back. Alexa sent photographs of the children that Kenneth posted on social media to Jasmine because Jasmine was blocked from his accounts. In her efforts to get her children back, Jasmine moved back to Illinois in 2018. Alexa explained that Jasmine was not able to contact the children because Kenneth and Kenneth's entire family blocked Jasmine from all forms of communication.

¶ 15   Sabrina Keleman, Jasmine's cousin, testified that she had regular contact with Jasmine, and Jasmine regularly spoke about the children and how she wanted to be in their lives. She believed that Jasmine did not seek custody before 2020 because Jasmine could not afford to hire an attorney, and she was living in California. Jasmine constantly showed her pictures of the children and bragged about them.

¶ 16   Christopher, Jasmine's boyfriend, testified that he and Jasmine lived together. He helped pay for her attorney so she could seek parenting time with the children. She would have been unable to afford it on her own. Jasmine talked about her children every day and had photographs of them displayed in their house. He believed that Jasmine cared about her daughters and wanted to visit them.

¶ 17   Jasmine testified that she had three children, one boy and twin girls. Her mother adopted her oldest child, but she was able to visit him. The last time she saw her twin daughters was in March or April 2017 at her last scheduled visit. While the children were in protective care in California, she never missed a scheduled visit. Once they moved to Illinois, the California court did not provide her with any scheduled parenting time, even though her attorney requested it. At that time, she did not have the financial resources to hire an attorney in Illinois. She was working full-time for the military and had another full-time job at Buffalo Wild Wings so she could afford her California attorney. She acknowledged that she missed the last hearing date but explained that she was hospitalized at the time. She was hospitalized for one month for attempted suicide, and she was unable to leave the hospital; she was "military-instructed" to be in the hospital program. While in the hospital, she attended daily classes that taught her coping skills. After she was released, she regularly attended therapy in California to deal with her depression, anxiety, and post-traumatic stress disorder. However, she never did any counseling

focused on child abuse. She maintained that she did not know the cause of the children's injuries that led to them being taken from her.

¶ 18    After the children moved to Illinois, Jasmine contacted Kenneth to see if he wanted them on her health insurance through the military, but he told her that they already had coverage. She also bought some Christmas presents and clothing for the children and left the items at her mother's house as Kenneth had told her to leave them there, and he would pick them up when the children visited their brother. However, he never went to get the items. While the children were in foster care, she bought them clothing, and she wanted to continue doing that after they moved to Illinois. She did not know Kenneth's address and did not think it was on any of the court documents that she received. If she had known his address, she would have sent things to the children. She searched for it on Google, but there were multiple addresses for him. She was also afraid that if she showed up at his house, he would have her arrested. He had previously told her to stop contacting him, and he would consider any further contact as harassment; she believed that meant he would have pursued legal action against her. She eventually stopped buying the children things because the items would just sit at her mother's house. If he had picked up the items from her mother's house or had given her an address, she would have continued to purchase clothing and gift cards for the children.

¶ 19    Jasmine explained that she was not financially able to file a petition requesting parenting time with the children before July 2020 because she was not employed and was going to school full-time, providing for her son, and maintaining her own home. However, in the meantime, she was trying to save money so she could hire an attorney because she wanted a relationship with her children.

¶ 20    On August 31, 2018, Jasmine was honorably discharged from the military due to her mental health. She then went to Florida for one month to take a break and visit friends. In October 2018, she moved to Illinois. She did not do anything legally to pursue parenting time with the children from October 2018 until July 2020. She never went to the courthouse to seek help in finding Kenneth or filing a petition seeking parenting time; she never asked any of her friends who were also friends with Kenneth for his address; and although she knew his grandmother's address, she never tried to contact the children or Kenneth through his grandmother. Also, her California attorney told her that she needed to retain an attorney in Illinois to pursue parenting time with the children, and she did not know that she could file the petition *pro se.*

¶ 21    Danny testified that he did not know how the children were injured because he was always working during that time. However, he testified that Jasmine had abused him when they were together; she punched, slapped, and scratched him. He acknowledged that he never reported the abuse to the police and had no photographs documenting it.

¶ 22    On April 6, 2021, the trial court entered an order, finding that Kenneth and Electa had proven, by clear and convincing evidence, that Jasmine was unfit to have the minor children in that under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)), she failed to maintain a reasonable degree of interest, concern, or responsibility for the minor children's welfare; under section 1(D)(n) of the Adoption Act (*id*. § 1(D)(n)) in that she evidenced an intent to forgo her parental rights by failing to maintain contact with, visit, communicate with, or plan for the future of the minor children for a period of 12 months; and under 1(D)(m)(i) of the Adoption Act (*id*. § 1(D)(m)(i)) in that she failed to make reasonable efforts to correct the conditions that led to the removal of the minor children from her home.

¶ 23 In making these findings, the trial court noted that Jasmine made no significant effort to establish contact or to provide for the minor children after April 2017. Although the court recognized that there were some barriers imposed by Kenneth, such as him blocking her phone number and social media accounts, it found that she made no effort to establish alternative means of communication or to send cards, letters, gifts, or other support for the children. The court noted that Jasmine creating a fake social media account to see the children's pictures may have served her interest, but it did nothing for the children. The court found that, in the context of a time where addresses were online and where Jasmine lived in the area and knew how to contact Kenneth's family members, her inaction demonstrated a lack of interest, concern, or responsibility. Also, the court found that Jasmine failed to do anything to demonstrate that she could provide a safe, healthy environment for the minors at any point after they were removed from her care. The court noted that she never sought treatment and never completed a mental health assessment, parenting classes, or any other services to address the concerns raised by the serious injuries suffered by the children while in her care. The court found that her testimony that she cared for and wished to be reunited with the children was not supported by the evidence in that she had failed to take actual steps to achieve her goals.

¶ 24 At the June 18, 2021, best-interest hearing, Samantha Dunn testified that she had known Kenneth and Electa for several years and had frequently observed them with the minor children. She testified that the children appeared happy and healthy and that Kenneth and Electa were good parents. Although Kenneth and Electa no longer lived together, they presented a united front to the children and did well coparenting.

¶ 25 Electa testified that she had been a coparent to the children for four years. She did not currently live with Kenneth, but they had a set schedule for the children, and they had been

10

effectively parenting together. She saw the children at least every other day if not daily. The children were healthy, did not have any residual issues related to their previous injuries, and were on track academically to start kindergarten in the fall. They had extended family that they were close to and were part of their lives. For fun, Kenneth and Electa took them fishing and to the park, family get togethers, and the pool. They loved Electa and considered her their mother, and she wanted to adopt them and give them a permanent home. She did not believe that terminating Jasmine's parental rights would negatively impact the children because they did not know Jasmine and had no relationship with anyone in Jasmine's family. She believed the children would be negatively impacted if they had a relationship with Jasmine and were told that she was their mother. She further believed that the children would be terrified if their living situation changed. Although she acknowledged that her and Kenneth's relationship had been off and on, she believed they could successfully coparent and keep their issues from impacting the children.

¶ 26    Kenneth testified that, regardless of whether he and Electa were living together, they could effectively coparent and provide the children with a stable environment. He believed that it would be in the children's best interests for Jasmine's parental rights to be terminated because they would not be safe with her. He also did not think that having a relationship with Jasmine's family would be good for them. However, he acknowledged that he did not know Jasmine currently, had no way of knowing whether the children would be safe with her now, and had no way of knowing whether she could provide a stable environment for them if she had parenting time. He was not willing to give Jasmine an opportunity to be a mother to the children because he did not know who had injured them, and Jasmine never took responsibility for the abuse that the children suffered while in her care.

11

¶ 27 Kenneth was not told that Jasmine was pregnant until she moved to California. While in California, she was living on an airbase, and he was not allowed to be there unless they were married. He did not visit the children the first three months of their lives because Jasmine told him that he was not allowed to.

¶ 28 Christopher testified that he had two children; he had parenting time with his daughter, and his son lived with him. He had been dating Jasmine for two years, and she currently lived with him. His children spent a lot of time with her, and she was their primary caregiver during the summer because she was a full-time student. She was an excellent mother to his children; she took them fishing, four-wheel riding, and to Six Flags; and she helped them with any of their medical needs. His former wife trusted Jasmine with the children, and they got along. He had no concerns with Jasmine's parental abilities, and he trusted her with his children. She had been a positive influence on the children's lives, and they looked up to her. She missed her own children, spoke about them often, and was hurt that she could not see them. He believed that she would be a good mother to them. She was going to school full-time and was serious about her studies. She had counseling books from her previous counseling sessions that she continued to read.

¶ 29 Cohl K., Christopher's 15-year-old son, testified that Jasmine was his stepmother, she had been in his life for two years, and she was very loving and caring. She was a good mother to him, and he loved her. She always kept him safe, took care of him when he was injured, and had never hurt him.

¶ 30 Jasmine testified that she had a good relationship with her oldest child, he called her mom, and she tried to be as actively involved in his life as possible with her mother being a healthcare worker. Before Covid-19, she saw him regularly, and they would go to birthday

parties, on four-wheeler rides, and camping. She was attending school at Southern Illinois University-Edwardsville full-time and also worked for the Veterans Affairs (VA) as a work-study student. She had another three years of school before graduating, and she wanted to become a high school teacher.

¶ 31 After Jasmine was hospitalized in California, she attended counseling once or twice a week for a little over one year. She was then discharged from the military and moved to Illinois to be closer to her children. She was enrolled in counseling through the VA, but she was on the waiting list for an appointment; she had been on the waiting list for about four months. She was in a much better place mentally than when she was living in California. She did not believe that it would be in her children's best interests for her parental rights to be terminated. She believed that it would be in their best interests to be around their extended family, to be around Christopher's family, and to have a relationship with her. She was willing to do anything to have parenting time with them, such as attending reunification counseling, and she believed that she could provide them with a stable home. She denied hurting the children while they were in her care, denied knowing that they were injured, and denied knowing who injured them.

¶ 32 The GAL then gave her report and recommendation. She noted that she spoke to Jasmine, Kenneth, and Electa; visited the minor children; reviewed the California Department of Children and Family Services records from the California case; and spoke to the California GAL. She noted that there was still no explanation for the children's previous injuries and that the permanency goal in California was not reunification with Jasmine due to the severity of the injuries. Since the children moved to Illinois, they had developed a strong bond with their father and Electa. She considered the following factors when making her recommendation: the children's need for safety and security, their sense of attachment, their need for stability, and

13

their adjustment to their present home. Although she acknowledged that termination of Jasmine's parental rights would affect the children's ability to have a relationship with Jasmine and her extended family, she believed that factor was outweighed by the others. Thus, she recommended that it was in the best interests of the minor children that Jasmine's parental rights be terminated and for the adoption to be granted.

¶ 33    On July 1, 2021, the trial court entered its order, finding that it was in the children's best interests for Jasmine's parental rights to be terminated. The court noted that, although Kenneth and Electa were unmarried and resided separately, they were committed to putting the children's interests first and were working together to maintain a safe and stable environment. The court also noted that, for most of the children's lives, Kenneth and Electa had provided for the children's daily needs and ensured their safety. There was no evidence that the children sustained injuries nor was there any indication of abuse or neglect while in their care. The children were developmentally on track and were integrated into both Kenneth's and Electa's extended families.

¶ 34    Although the trial court believed that Jasmine sincerely loved and cared for the children, the best interests of the minor children was the only issue before the court at that time. The court noted that Jasmine had no contact with the children for almost four years; they were initially removed from her care after sustaining multiple severe injuries, which were still unexplained; and the California court determined that returning the children to Jasmine was not in their best interests. The court acknowledged the testimony presented by Jasmine about her close relationship with her fiancé's children, but it noted that those children were significantly older than the minor children and would be able to protect themselves and report any concerns. The

14

court was not convinced that Jasmine could provide a safe and stable environment for the children. Thus, the court terminated her parental rights. Jasmine appeals.

¶ 35                             II. ANALYSIS

¶ 36                          A. Fitness Determination

¶ 37                    1. *The Applicable Law and Standard of Review*

¶ 38    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). It must first be established, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *D.F.*, 201 Ill. 2d at 494-95. Because each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 39    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). The burden of presenting clear and convincing evidence of unfitness is on the party petitioning for adoption. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68 (2005). A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d

15

985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *D.F.*, 201 Ill. 2d at 498. A trial court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 40 Here, the trial court found Jasmine unfit on the following three grounds: (1) she evidenced an intent to forgo her parental rights by failing to maintain contact with, visit, communicate with, or plan for the future of the minor children for 12 months; (2) she failed to maintain a reasonable degree of interest, concern, or responsibility for the minor children's welfare; and (3) she had not made reasonable efforts to correct the conditions that led to the removal of the minor children from her care. Jasmine contends that these findings were against the manifest weight of the evidence. In response, Kenneth and Electa concede that the court's finding that Jasmine failed to make reasonable efforts to correct the conditions that led to the removal of the minor children was against the manifest weight of the evidence. However, they contend that the other two findings were not against the manifest weight of the evidence.

¶ 41                    2. *Intent to Forgo Parental Rights*

¶ 42 The first ground for unfitness was that Jasmine intended to forgo her parental rights by failing to visit, communicate, or maintain contact with the children for more than a year. 750 ILCS 50/1(D)(n) (West 2020). In the absence of evidence to the contrary, the trial court presumes that the parent has the ability to visit, communicate, maintain contact, pay expenses, and plan for the future. *Id.* A parent's subjective intent that is not supported by evidence

16

manifesting that intent does not prevent the court from finding the parent intended to forgo her parental rights. *Id.* In making a determination on this fitness ground, the court can consider impediments caused by petitioner within the relevant 12-month period. *In re Adoption of H.B.*, 2012 IL App (4th) 120459, ¶ 29. The relevant 12-month period begins with the parent's last contact or communication with the child. *Id.* ¶ 35.

¶ 43 Here, Jasmine's last contact with the children was in March or April 2017 and her last contact with Kenneth about the children occurred in late 2017. However, Jasmine argued that the testimony presented at the fitness hearing showing a lack of contact did not evidence an intent to forgo her parental rights but instead was the result of the obstacles that Kenneth placed in her way to prevent her from having contact with the children. Specifically, she noted that Kenneth told her to stop calling, or he would consider any further attempts of contact as harassment; he blocked her phone number; he blocked her on his social media accounts, so she could not contact him or see the posts that he made about the children; and he also had his family block her on social media. She also noted that the evidence indicated that she did not have Kenneth's address; she had bought clothes and toys for the children, but Kenneth never picked the items up; she was hospitalized for one month in California during the pendency of the juvenile proceedings and was unable to attend the last hearing date; she was told by her California attorney that she needed to retain an Illinois attorney to seek parenting time with the children; she was attempting to treat her serious mental health issues during this time; and she did not have the financial resources to pursue parenting time when she initially moved to Illinois.

¶ 44 She argues that the manifest weight of the evidence showed that her lack of communication or visits with the children was primarily motivated by Kenneth's successful

attempts to thwart any contact with them, as well as her lack of financial resources, and not because of any indifference or lack of concern on her part.

¶ 45    In support of her position that the trial court should consider the obstacles and barriers that Kenneth placed in her way, she cites *In re Adoption of H.B*., 2012 IL App (4th) 120459. There, the minor child's aunt, who had been given joint temporary custody of the child, sought to terminate the mother's parental rights because the mother was unfit based on, among other things, the mother's intent to forgo her parental rights. *Id.* ¶ 3.  However, in explaining her lack of contact, the mother testified that the aunt had told her not to call anymore and that the minor child did not want to see her. *Id.* ¶ 35.  The appellate court found that it was appropriate for the trial court to consider the objective impediments that the aunt placed in the mother's way to discourage the mother from having a relationship with the minor child when determining whether the mother had the intent to forgo her parental rights. *Id.*  The court also found that it was appropriate for the trial court to consider the fact that the aunt left the decision of whether to have contact with the mother up to the minor child. *Id.*  Based on those two impediments, which occurred within the 12-month period, the appellate court agreed with the trial court that the aunt had failed to prove that the mother intended to forgo her parental rights by clear and convincing evidence. *Id.*

¶ 46    Here, the trial court made the following findings.  When the minor children were approximately three months old, they were taken into protective custody after being seriously injured while in Jasmine's care.  The injuries they suffered were deemed nonaccidental and remained unexplained.  Ultimately, the children were given to their father, who brought them to Illinois.  Jasmine was not offered reunification services in California because of the severity of the injuries and was not given any parenting time after the California case was closed.

18

¶ 47    Jasmine was discharged from the military and moved to Illinois in late 2018, and, from approximately December 2017 until July 2020, when she filed the petition seeking parenting time, she made no effort to contact Kenneth or the minor children and made no effort to provide any support for the children. Although the trial court acknowledged that Jasmine bought some clothes and toys for the children and left them at her mother's house, and Kenneth blocked Jasmine's phone number and social media accounts, the court found that Jasmine made no effort to establish alternative means of communication with the children. The court noted that Jasmine could have reached out to Kenneth through his family members, or she could have obtained his address through an internet search or their mutual friends. The court also noted that she did not send any cards, letters, or gifts, and she did not provide any support for the children.

¶ 48    Given the facts that Jasmine had not pursued alternative means of communication, had not attempted to find Kenneth's address to send cards and/or gifts, and had not sought any parenting time with the children after they were moved to Illinois, we find that the trial court's decision was not against the manifest weight of the evidence. In making this decision, we recognize Jasmine's reliance on *In re Adoption of H.B*. However, we note that each case concerning parental unfitness is *sui generis*, which requires a close analysis of its individual facts. *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010). Thus, factual comparisons to other cases by reviewing courts are of little value. *Id.* Notwithstanding this, the trial court here considered the objective barriers that Kenneth placed in Jasmine's way to keep her from having contact with the minor children. However, unlike the court in *In re Adoption of H.B.*, the trial court here concluded that, even after taking into account those barriers, Kenneth and Electa had proven, by clear and convincing evidence, that Jasmine evidenced an intent to forgo her parental rights.

19

Like *In re Adoption of H.B.*, we find that the trial court's decision was not against the manifest weight of the evidence.

¶ 49          3. *Reasonable Degree of Interest, Concern, or Responsibility*

¶ 50    The second unfitness ground is that Jasmine failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. In determining whether a parent has shown reasonable interest, concern, or responsibility, the trial court should examine the parent's conduct in the context of the circumstances in which it occurred. *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). Circumstances that should be considered include a parent's failure to personally visit the children and a parent's failure to otherwise attempt to communicate with the children. *Id.* at 279. However, if personal visits are impractical, then letters or telephone calls may demonstrate a reasonable degree of concern, interest, or responsibility. *Id.* The court should focus on the reasonableness of the parent's efforts and not necessarily on the success of those efforts. *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). The court should also consider any circumstances that made it difficult for the parent to show interest, concern, or responsibility for the children's well-being. *Id.*

¶ 51    Here, the trial court found that Jasmine failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. As stated above, the court found that Jasmine made no significant effort to establish contact or to provide support for the minor children after they moved to Illinois. Recognizing the obstacles imposed by Kenneth, the court concluded that Jasmine made no effort to establish alternative means of communication or to send cards, letters, gifts, or other support. Although she established the fake social media account, the account served her own interests and did nothing for the minor children. The court further concluded that, in the context of a time where addresses could be found with an internet

20

search, and where Jasmine lived in the area and knew how to contact some of Kenneth's family members, Jasmine's inaction demonstrated a lack of interest, concern, or responsibility. The court also noted that Jasmine failed to attend parenting classes or seek treatment that would address the serious injuries that the children sustained while in her care. Based on the record before us, we find that the court carefully considered the evidence that was presented when making its decision and that decision was not against the manifest weight of evidence.

¶ 52                      B. The Best-Interest Determination

¶ 53    If the trial court finds that the parent is unfit, the matter proceeds to a second hearing, at which it must be proven that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best-interest stage, all considerations must yield to the best interest of the child and the parent's interest in maintaining a parent-child relationship yields to the child's interest in a stable, loving home life. *Id.*

¶ 54    In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *In re Dal. D.*, 2017 IL App (4th)

21

160893, ¶ 52; see also 705 ILCS 405/1-3(4.05) (West 2020). However, the court's best-interest determination does not have to contain a specific reference to each of the statutory factors. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 58.

¶ 55 Here, the GAL recommended that Jasmine's parental rights be terminated because the minor children had a strong bond with Kenneth and Electa, and the impact that termination would have on their ability to have a relationship with Jasmine and her extended family was outweighed by their need for stability, their safety and security, and their adjustment to their present home. Agreeing with the GAL, the trial court found that termination of Jasmine's parental rights was in the minor children's best interests. In so deciding, the court acknowledged that Kenneth and Electa presented a unique situation, being unmarried and residing separately, but found that they were both committed to the minor children and put their interests first. The court noted that they both openly testified about the difficulties they faced in their own relationship, but each made it clear that they kept the minor children out of those issues, and they were working together to maintain a safe and stable home environment.

¶ 56 The trial court also noted that, for most of the minor children's lives, Kenneth and Electa provided for their daily needs and ensured their safety. There was no evidence that the minor children had sustained any injuries or had suffered any abuse or neglect while in their care. The children were developmentally on track and were integrated into the extended families. The court noted that, although Jasmine testified about her enduring love and concern for the minor children, and it believed that she was sincere, determining the best interests of the minor children was its only concern. The children were initially removed from Jasmine's care after they sustained multiple severe injuries, which were still unexplained. The children were currently five years old and only knew Kenneth and Electa as their parents. The court recognized that

Jasmine presented testimony from her fiancé and his son about her relationship with and care of her fiancé's children but noted that those children were significantly older than the minor children, they would be able to protect themselves, and they would be able to report any concerns. The court was not convinced that Jasmine would be able to provide a safe and stable environment for the minor children and found, by a preponderance of the evidence, that it was in the best interests of the minor children to terminate her parental rights. Given the above, we conclude that, after considering the statutory factors, the trial court's finding that it was in the minor children's best interests to terminate Jasmine's parental rights was not against the manifest weight of the evidence. Although Jasmine argues that the court failed to adequately address all of the best-interest factors, we note that the court's best-interest determination does not have to contain a specific reference to each of the statutory factors, and there is nothing in the record to indicate that the court did not properly consider the requisite factors when making its decision. Thus, we affirm the court's best-interest finding.

¶ 57                                    III. CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 59    Affirmed.